# UNITED STATES of America, Plaintiff,

v.

# Vincenzo CIRILLO, Defendant.

## No. MISC. 99–393–1.

United States District Court,
E.D. Pennsylvania.

June 8, 1999.

Theodore Simon, Philadelphia, PA, for Vincenzo Cirillo, Defendant.

Linwood C. Wright, Jr., Philadelphia, PA, for U.S.

## MEMORANDUM

ROBRENO, District Judge.

## I. INTRODUCTION

Defendant, Vincenzo Cirillo, is a Canadian national who was arrested in Philadelphia, Pennsylvania pursuant to a complaint and warrant, charging him with conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846. Magistrate Judge Charles Smith held a probable cause and pretrial detention hearing over the course of two days, at the conclusion of which Magistrate Judge Smith found that the Government had shown probable cause. However, Magistrate Judge Smith denied the Government's motion for pretrial detention and released defendant on bail in the amount of $500,000–10% cash, subject to certain conditions. Before the Court is the Government's motion for revocation of Magistrate Judge Smith's release order pursuant to 18 U.S.C. § 3145(a) and for pretrial detention. For the reasons that follow, the Court will revoke Magistrate Judge Smith's release order of May 25, 1999 denying the Government's motion for pretrial detention and will order defendant held in custody pending trial.[1]

## II. FACTS

On May 16, 1999, Michel Bleeker ("Bleeker") traveled from Amsterdam, Holland to Philadelphia, Pennsylvania. (Craven Aff. at ¶ 2.) During inspection by the United States Customs Service at the Philadelphia International Airport, a Customs Inspector discovered approximately 8.95 pounds of "ecstasy," an "enhancer" or "distorting" drug, which is a derivative of methamphetamine, hidden in a false compartment in a suitcase. (Craven Aff. at ¶ 3). The ecstasy was valued between $300,000 and $500,000. (Tr. of May 21, 1999 at 20.) Bleeker was detained and decided to cooperate with the Government. (Craven Aff. at ¶¶ 4, 6; Tr. of May 21, 1999 at 62.) Bleeker informed the Customs Agents that he was originally scheduled to arrive in the United States on May 15, 1999 via a U.S. Airways flight from Amsterdam to Philadelphia. However, Bleeker at the last moment changed his travel plans and took a flight via Northwest Airlines on the following day, May 16, 1999. (Craven Aff. at ¶ 11; Tr. of May 21, 1999 at 99–100.) Bleeker told Customs Agents that he had no knowledge of the contents of the suitcase, and that, in return for $1,500.00, he was supposed to deliver the suitcase to another person at the Comfort Inn on Christopher Columbus Boulevard in Philadelphia, Pennsylvania. (Craven Aff. at ¶ 4; Tr. of May 21, 1999 at 69, 83–84.) Customs Agents escorted Bleeker to the Comfort Inn, where the agents kept Bleeker under surveillance. (Craven Aff. at ¶ 6; Tr. of May 21, 1999 at 62.)

Also on May 16, 1999, defendant, Vincenzo Cirillo, who is a Canadian national, traveled via U.S. Airways from Amsterdam, Holland to Philadelphia International Airport, accompanied by Roberto Alpinelli ("Alpinelli") and Alex Sirakoulas ("Sirakoulas"). (Tr. of May 21, 1999 at 64.) During inspection by Customs Agents, defen-

---

1. An order revoking Magistrate Judge Smith's order of May 25, 1999 was issued from the bench orally at the conclusion of the June 3, 1999 hearing. The core of the Court's rea- soning was stated on the record. This memorandum expands on the Court's reasoning for its decision.

dant informed the agents that in a few hours, he was to catch another flight to return to Canada. Based on defendant's representations and a valid airline ticket in defendant's name for a flight from Philadelphia to Toronto, Canada that same evening, the Customs Inspector marked defendant's declaration form as "in transit." (Tr. of May 21, 1999 at 53.) "In transit" meant that defendant would not be staying in the United States beyond his subsequently scheduled flight to Canada. (Tr. of May 21, 1999 at 53–54.) To the contrary, defendant did not catch his connecting flight to Canada. Rather, defendant, along with Alpinelli and Sirakoulas, checked into the same hotel as Bleeker, the Comfort Inn, under a false name, Mike Fusco. (Craven Aff. at ¶ 6; Tr. of May 21, 1999 at 64, 77.)

The following morning, on May 17, 1999, defendant called Bleeker and arranged to come to Bleeker's room. (Craven Aff. at ¶ 7.) As planned, defendant and Alpinelli went to Bleeker's room. While defendant remained in the hallway, Alpinelli stood in the doorway of Bleeker's room. (Craven Aff. at ¶ 8; Tr. of May 21, 1999 at 71.) Neither defendant nor Alpinelli entered the room. (Craven Aff. at ¶ 8; Tr. of May 21, 1999 at 71.) While Alpinelli stood at the door, Bleeker asked Alpinelli if Alpinelli wanted "the stuff." (Craven Aff. at ¶ 8.) Alpinelli abruptly left without the suitcase, and together with defendant, both retreated to the hotel lobby. (Craven Aff. at ¶ 10.) Defendant and Alpinelli were then arrested and searched. (Craven Aff. at ¶ 11). Customs Agents found defendant in possession of approximately $2,000.00. (Tr. of May 26, 1999 at 74.) Customs Agents also found the airline tickets for defendant, Alpinelli, and Sirakoulas, all of which were replacement tickets for a previously scheduled U.S. Airways flight on May 15, 1999 from Amsterdam to Philadelphia, the same flight that Bleeker was originally scheduled to take, and from which Bleeker had switched to the Northwest Airlines flight on May 16, 1999. (Craven Aff. at ¶ 11; Tr. of May 21, 1999

at 99–100.) Defendant and Alpinelli were charged with conspiracy to possess with intent to distribute methamphetamine, and Bleeker was charged with possession with intent to distribute methamphetamine.

At the conclusion of the probable cause and pretrial detention hearing on May 21, 1999, Magistrate Judge Smith concluded that, as to Alpinelli, the Government failed to show probable cause, and Alpinelli was dismissed from the case. (Tr. of May 21, 1999 at 103.) Magistrate Judge Smith asked for further briefing on certain of the issues raised by defendant and scheduled a second hearing for May 25, 1999. After the hearing on May 21, 1999, the Government further debriefed Bleeker, who disclosed for the first time that he had engaged in a transaction with the same modus operandi as the instant transaction with defendant, on March 11, 1999, at the same Comfort Inn. (Tr. of May 25, 1999 at 19–20.) Bleeker informed the Government that on March 11, 1999, Bleeker met defendant at the Comfort Inn, where defendant paid Bleeker $1,500.00 in exchange for transporting the same suitcase. (Tr. of May 25, 1999 at 5–6.) At the conclusion of the second hearing, and aided by this additional information, Magistrate Judge Smith found there was probable cause to hold defendant for trial.

Magistrate Judge Smith, however, denied the Government's motion for pretrial detention, and released defendant on bail in the amount of $500,000–10% cash, subject to certain conditions. (Tr. of May 25, 1999 at 37.) The following conditions were imposed upon defendant: (1) sign an irrevocable waiver of extradition; (2) travel is restricted to Ontario, Canada and Philadelphia, Pennsylvania; (3) report every other day by telephone to Pretrial Services in Philadelphia, Pennsylvania; (4) live at home with defendant's parents in Ontario, Canada; and (5) a $500,000–10% cash bond shall be signed by defendant's sister, the fiancee of defendant's sister, and a family

608

friend. (Tr. of May 25, 1999 at 37–44.) In response, the Government filed an emergency motion for revocation of release order and appeal pursuant to 18 U.S.C. § 3145(a), alleging that defendant is a risk of flight and a danger to the community. The Court held hearings on May 26, 1999 and June 3, 1999, at which time, it heard testimony from Special Agent Robert E. Craven, received additional documents into evidence, and heard argument from counsel. The Court has also reviewed the transcripts of the hearings before Magistrate Judge Smith.

III. ANALYSIS

 Pursuant to the Bail Reform Act, pretrial detention may be ordered "[i]f, after a hearing ... the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community...." 18 U.S.C. § 3142(e).[2] In determining whether pretrial detention is warranted, the Bail Reform Act provides four factors to be considered by the court:

(1) [t]he nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g). For the court to order pretrial detention, the Government must show by clear and convincing evidence that defendant is a danger to the community, and/or must show by a preponderance of the evidence that there is a serious risk of flight. See 18 U.S.C. § 3142(f); United States v. Himler, 797 F.2d 156, 161 (3d Cir.1986). In this case, the Government contends that defendant is a serious risk of flight.[3]

2. The Court notes that § 3142(e) of the Bail Reform Act also creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person and safety of the community if the judicial officer determines that there is probable cause to believe that the person committed an offense that carries a maximum term of imprisonment of ten years or more. See 18 U.S.C. § 3142(e). In this case, however, the rebuttable presumption is not applicable as defendant only faces a range of imprisonment from sixty-three (63) to seventy-eight (78) months, pursuant to the Sentencing Guidelines, for a person who has an offense level of twenty-six (26) and a criminal history category of I. Therefore, the burden remains on the Government to show that defendant is a risk of flight and/or a danger to the community.

3. The Government asserts that its primary justification for pretrial detention of defendant is because defendant poses a serious risk of flight. With less strength, the Government also contends that defendant is a danger to the community on the ground that he was trafficking drugs through Philadelphia. Given the stricter standard regarding proof of a danger to the community, it is evident that the Government has failed to show by clear and convincing evidence that defendant poses a danger to the community. Although it is alleged that defendant was trafficking drugs through Philadelphia, the evidence before the Court reveals that defendant intended to take the drugs to Canada, and not to distribute the drugs in Philadelphia. Therefore, the Court's analysis of whether defendant should be subject to pretrial detention focuses on the serious risk of flight, and not on any danger to

■ After reviewing the transcripts of the hearings before Magistrate Judge Smith, and conducting two additional hearings, the Court finds that the Government has shown by a preponderance of the evidence that there is a serious risk of flight and that no condition or combination of conditions will reasonably assure the appearance of defendant as required. In reaching this conclusion, the Court considers the following factors:

1. Defendant is a Canadian national with no ties to either the United States in general or the Eastern District of Pennsylvania in particular, and who retains a valid passport.

2. Defendant faces up to seventy-eight (78) months of imprisonment, if convicted, pursuant to the Sentencing Guidelines.

3. Defendant's passport indicates that since March, 1997, defendant has taken several trips abroad, including one (1) trip to Venezuela, five (5) trips to the Bahamas, four (4) trips to the United States, and two (2) trips to the Netherlands.

4. Upon arrest and detention, Customs Agents found defendant with approximately $2,000.00 in his possession, an amount sufficient to pay the $1,500.00 that Bleeker contends he was owed for delivering the suitcase containing the drugs.

5. A letter from counsel at the Canadian Ministry of Justice advises that there is legal difficulty in executing an appearance bond and collecting judgment in Canadian courts in the event of a default.

6. The same letter from counsel at the Canadian Ministry of Justice also declares that there is legal uncertainty whether defendant may be extradited from Canada, and, if so, whether such proceedings would be lengthy.

7. Defendant could not be subject to in-person supervision by Pretrial Services while on bail in Canada.

8. The evidence shows that defendant arrived in the United States from a city that is the primary source for the manufacture of "ecstasy," that he is employed in a trade, specifically, as owner of a nightclub, where ecstasy is widely consumed, that he was originally scheduled to take the same airline flight from Amsterdam to Philadelphia as Bleeker, the alleged drug courier in this case, but at the last moment both changed to a later flight and Bleeker changed to a later flight on a different airline, that he was identified by Bleeker as the person with whom he dealt in a prior transaction in Philadelphia with the same modus operandi, that he called Bleeker from the hotel lobby and arranged to come to Bleeker's hotel room, and that an amount of ecstasy valued between $300,000 and $500,000 was found in the false bottom of Bleeker's suitcase.

9. There is evidence of defendant's consciousness of guilt because defendant provided false information to Customs Inspectors concerning his travel plans so as to disguise his visit to the United States, and registering at a hotel under a false name.

■ 10. The Court finds that the evidence against defendant at this early stage in the proceedings, that he was the buyer of a large quantity of drugs in this transaction, rises to the level of more than probable cause.[4]

---

the community posed by release of defendant pending trial.

**4.** Defendant claims that under the authorities of *United States v. Idowu,* 157 F.3d 265 (3d Cir.1998), *United States v. Thomas,* 114 F.3d 403 (3d Cir.1997), *United States v. Wexler,* 838 F.2d 88 (3d Cir.1988), and *United States v. Cooper,* 567 F.2d 252 (3d Cir.1977), based on the evidence proffered by the Government so far, the case would be subject to dismissal under Federal Rule of Criminal Procedure 29 because the Government cannot show that defendant knew he was involved in a drug transaction. Even if this were true, and in light of all of the factors to be considered under 18 U.S.C. § 3142(g), it would not compel release, since the relative strength of the evidence against defendant is only one factor to be considered in the complex calculus involved in the decision to grant pretrial detention. At this early stage of the proceedings, the Government needs not show, as a prereq-

Defendant has attempted to rebut the Government's case as follows:

1. Defendant has agreed to execute an irrevocable waiver of extradition, which provides that defendant will appear at all required court appearances and irrevocably waives any and all rights defendant may have to contest extradition either in Canada or anywhere else in the world. Defendant proffered a letter from Canadian counsel that such a waiver is enforceable in Canadian courts. On the other hand, the Government proffered a letter from counsel at the Canadian Ministry of Justice,[5] which states:

> Firstly, a waiver of extraditability signed by a defendant in the United States is not enforceable in Canada. If the defendant were to contest his return, the United States would have to initiate extradition proceedings to have the fugitive returned.
>
> On the issue of collecting Canadian assets in a bail forfeiture proceeding, this is not a simple matter in our own domestic proceedings. It must be enforced like a civil debt.
>
> While Canada extradites its nationals, it is not a simple matter. Extradition from Canada involves two distinct phases. The first phase, often referred to as the "judicial phase," requires an extradition judge to determine, on the basis of the affidavit of evidence submitted by the requesting state, whether the conduct in the foreign state would constitute an offence in Canada if it had occurred here and if there is sufficient evidence to put the fugitive on trial.
>
> In the second, or "executive" phase, the Minister of Justice must make a decision whether the fugitive should be surrendered to the requesting state in accordance with the relevant extradition treaty.

> The decision of the extradition judge and the decision of the Minister of Justice on surrender are subject to appeal to the Court of Appeals of the province and possibly to the Supreme Court of Canada.
>
> If the fugitive contests extradition and pursues his right of appeal, the entire process can take two to three years.

Letter of May 27, 1999 from Barbara Kothe to True Rowan at 1–2. The Court concludes, based upon the letter from counsel at the Canadian Ministry of Justice, that there is substantial legal doubt and uncertainty as to whether the irrevocable waiver of extradition would be given full force and effect by Canadian courts.

2. Defendant has agreed to put up the stock of a corporate fitness center owned by his father, which he estimates is worth $800,000.00, and to grant the United States a mortgage, which would give the United States a junior position on the family home, which defendant contends has equity in the amount of $250,000.00. Again, based upon the letter from counsel at the Canadian Ministry of Justice, and in the absence of a showing that under Canadian real property law, foreclosure and execution could be carried out in the manner suggested by defendant, the Court finds that there is substantial legal doubt and uncertainty concerning the real value of the these foreign sureties.

3. Defendant contends that he has a counterincentive not to flee in that if he did so, he would forfeit any claim to serve his sentence in Canada rather than in the United States, if convicted, pursuant to the Prisoner Transfer Treaty between the United States and Canada. The Court agrees that this is a counterincentive, but finds that it is not of significant magnitude to reasonably assure defendant's presence at trial.

uisite to obtaining pretrial detention, that it can prove its case beyond a reasonable doubt.

**5.** The letter from counsel at the Canadian Ministry of Justice was not available to Magistrate Judge Smith prior to his order denying pretrial detention of defendant.

4. Defendant is a first-time offender without a prior history of drug dealing or trafficking, and ecstasy, the drug involved in the transaction, is an "enhancer" or "distorting" drug, and not a narcotic drug.

## IV. CONCLUSION

Given the difficulty of effectuating extradition and the legal uncertainty involved in executing on an appearance bond and foreclosing on a mortgage in Canada, in light of the relative strength of the evidence at this early stage in the proceedings, and considering defendant's prior extensive foreign travel, and use of a false identity, and taking into account the significant period of incarceration facing the defendant, if convicted, and the difficulty of implementing a program of effective supervision in Canada while defendant is on bail, the Court finds that no condition or combination of conditions will reasonably assure defendant's presence at trial.

An appropriate Order follows.

## *ORDER*

**AND NOW**, this **8th** day of **June, 1999**, upon consideration of the Government's motion for revocation of release order and appeal, it is hereby **ORDERED** that the motion is **GRANTED**.[1]

It is further **ORDERED** that defendant be committed to the custody of the United States Marshal Service pending trial.

**AND IT IS SO ORDERED.**

---

1. This written order memorializes the Court's oral order issued from the bench on June 3, 1999.